DONOFRIO, J. dissenting.
{¶ 46} Because I would find that genuine issues of material fact preclude summary judgment, I respectfully dissent from the majority's opinion.
{¶ 47} The determination of whether or not a political subdivision is generally immune from tort liability for injuries or death to a person is a three-tiered analysis. Rastaedt v. Youngstown , 7th Dist. No. 12 MA 0082, 2013-Ohio-750, 2013 WL 793597, ¶ 10.
*1001 {¶ 48} With regard to the first tier, the parties agree that appellee is a political subdivision entitled to immunity from tort liability under R.C. 2744.02(A). Thus, I will address the second and third tiers of the analysis.
{¶ 49} As to the second tier, appellant argues that R.C. 2744.02(B)(3) removes the immunity protection enjoyed by appellee. That section provides, in pertinent part:
political subdivisions are liable for injury, death, or loss to person or property caused by their negligent failure to keep public roads in repair and other negligent failure to remove obstructions from public roads[.]
{¶ 50} "Public roads" are defined in R.C. 2744.01(H) :
"Public roads" means public roads, highways, streets, avenues, alleys, and bridges within a political subdivision. "Public roads" does not include berms, shoulders, rights-of-way, or traffic control devices unless the traffic control devices are mandated by the Ohio manual of uniform traffic control devices.
{¶ 51} If the signs in this case are mandated by the Ohio Manual of Uniform Traffic Control Devices ("OMUTCD"), they are included in the definition of a public road. R.C. 2744.01(H). Yonkings v. Piwinski , 10th Dist. Nos. 11AP-07, 11AP-09, 2011-Ohio-6232, 2011 WL 6036950, ¶ 22-24. The negligent failure to keep the signs [public roads] "in repair" would expose appellee to liability for injury, death, or loss to person caused by its negligence.
{¶ 52} The trial court, in granting appellee's motion for summary judgment, concluded that none of the three signs questioned here are mandatory and, therefore, appellee's immunity was not excepted by R.C. 2744.02(B)(3).
{¶ 53} Appellant argues that either, or both, the hospital sign and the accompanying directional sign are mandated by the OMUTCD.
{¶ 54} Whether or not the hospital sign was mandatory, once appellee erected the hospital sign, it was mandatory that a directional message be posted. The General Service Signs section provides:
General Service signs, if used at intersections, shall be accompanied by a directional message.
(Emphasis in original). This section is not only in bold type, it is under the heading "Standard", meaning that it is mandatory or required.
{¶ 55} Once the hospital sign was installed, a directional message became mandatory. Although appellee may have had discretion as to what type of "directional message" to employ, once it made that decision, its directional message had to comply with the height requirements of the OMUTCD.
{¶ 56} As to the part of R.C. 2744.02(B)(3) that makes political subdivisions liable for injury or death "caused by their negligent failure to keep public roads in repair," the statute does not define "in repair."
{¶ 57} The trial court, and appellee, rely upon our decision in Bonace v. Springfield Twp ., 179 Ohio App.3d 736, 2008-Ohio-6364, 903 N.E.2d 683 (7th Dist.). The trial court emphasized the example given in Bonace of fixing holes and crumbling pavement in a street with regard to the meaning of "in repair." Id. at ¶ 29. Appellee argues that the ordinary meaning of "in repair" does not include a sign that is not in conformity with the height requirements of the OMUTCD. However, this court did not limit the meaning of the words "in repair" to only situations of deterioration or disrepair. This was the interpretation of the trial court. (Judgment Entry, p. 7). Further, this court's decision in Bonace *1002 did not rest upon an interpretation of the words "in repair." Rather, we concluded that the township did not lose its immunity there because the conditions at issue in Bonace did "not deal with a failure to make a repair, but rather constitute failures to construct or problems with design." Id. at ¶ 31. And we concluded that the conditions involved ditches and berms, which are not part of a public road as defined in R.C. 2744.02(B)(3). The parties do not dispute that the signs here, unlike in Bonace , were installed after the original road construction and were not a part of the original design and construction. Based on the facts in this case, a jury could find that an improperly installed sign constituted a negligent failure to keep a public road in repair.
{¶ 58} The trial court concluded that even if appellant established an exception to immunity pursuant to R.C. 2744.02(B)(3), appellee was nevertheless entitled to summary judgment since it had a defense under R.C. 2744.03(A)(3) and R.C. 2744.03(A)(5). This is the third tier of analysis. Rastaedt at ¶ 10.
{¶ 59} R.C. 2744.03(A)(3) provides:
The political subdivision is immune from liability if the action or failure to act by the employee involved that gave rise to the claim of liability was within the discretion of the employee with respect to policy-making, planning, or enforcement powers by virtue of the duties and responsibilities of the office or position of the employee.
And R.C. 2744.03(A)(5) provides:
The political subdivision is immune from liability if the injury, death, or loss to person or property resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner.
{¶ 60} The trial court found that the decision to either raise or remove the signs was discretionary. The trial court then concluded that appellant offered no evidence that this decision was made with malicious purpose, in bad faith, or in a wanton or reckless manner. Thus, the trial court held that these two statutes reinstated sovereign immunity and summary judgment for appellee was appropriate.
{¶ 61} Once appellee knew the height of the sign was contrary to the requirements of the OMUTCD, any decisions about how to correct the problem were not the type of judgment or discretion intended in R.C. 2744.03(A)(5). How to correct the height problem was not an executive or planning function, nor did it require a policy decision.
{¶ 62} Even if the decision to correct the problem with the height requirements was discretionary, appellee still had a duty to correct the situation within a reasonable time. In Garland v. Ohio Dept. of Transp ., 48 Ohio St.3d 10, 12, 548 N.E.2d 233 (1990), the court stated: "We hold that once an agency has made a discretionary decision, it has a reasonable amount of time to implement that decision without incurring tort liability." Id.
{¶ 63} Donham testified that in the spring of 2011 he instructed the sign crew to move the hospital and directional arrow signs. (Donham Dep. 71). A year later, at the time of the accident, they had not been moved. (Donham Dep. 71). According to Donham, the cost to remove the two signs was "incidental * * * virtually nothing." (Donham Dep. 60-61). It was "a pretty easy thing to do." (Donham Dep. 87-88). Thus, appellee had to implement its decision to move the sign in a reasonable amount of time and, considering the above *1003 facts, whether it did so is a genuine issue of material fact making summary judgment inappropriate.
{¶ 64} Moreover, I would find the trial court erred by resolving disputed questions of fact in favor of appellee with regard to the issue of causation. Another reason offered by the trial court for granting summary judgment was that appellant could not establish probable cause. The trial court concluded that the accident reconstruction expert's opinion offered by appellant was mere speculation because the expert never visited the site and did not have specific information regarding where Tareshawty was located in the roadway prior to the accident. The trial court emphasized that Tareshawty indicated no signs or poles obstructed his view and that he just did not see Emmerling's motorcycle.
{¶ 65} Where reasonable minds can differ on the issue of proximate cause, the issue is properly submitted to the jury. Fannin v. Cubric , 21 Ohio App.2d 99, 255 N.E.2d 270 (4th Dist.1970) citing Glasco v. Mendelman , 143 Ohio St. 649, 56 N.E.2d 210 (1944), and White v. Ohio Power Co ., 171 Ohio St. 148, 168 N.E.2d 314 (1960). Ordinarily, the determination of whether negligent conduct is the proximate cause of an injury is a question of fact. State Farm Mut. Ins. Co. v. VanHoessen , 114 Ohio App.3d 108, 682 N.E.2d 1048 (1st Dist.1996) citing Strother v. Hutchinson , 67 Ohio St.2d 282, 288, 423 N.E.2d 467 (1981), and Reed v. Weber , 83 Ohio App.3d 437, 442, 615 N.E.2d 253 (1st Dist.1992).
{¶ 66} At the time of the accident, Tareshawty was 16 years old. (Tareshawty Dep. 10, 12). Tareshawty testified:
"Q Was there anything in your experience before the date of the collision, that obstructed a driver's view to the left, when preparing to make a turn from McClurg onto north bound South Avenue?
"A No.
"Q Did any of the signs or telephone poles in your estimation obstruct a driver's view when turning from McClurg onto north bound South Avenue?
"A No.
(Tareshawty Dep. 46-47). This is the testimony emphasized by the trial court. But we must consider the balance of Tareshawty's testimony.
{¶ 67} Tareshawty further testified that on the day of the collision he first stopped at the white line on the pavement marking the point at which he should stop. (Tareshawty Depo. 59). He then "creeped" his vehicle forward in order to see the north bound traffic proceeding down a hill. (Tareshawty Depo. 59-60). The reason he crept forward is because cars in the far right hand lane on McClurg proceeding in the same direction (easterly) as Tareshawty were blocking his view of the north bound traffic on South Avenue. (Tareshawty Dep. 59-60). Tareshawty continued:
Q How did creeping forward affect your ability to see traffic coming from your left, if at all?
A Um, I really don't remember.
(Tareshawty Dep. 61).
{¶ 68} Tareshawty testified that traffic in both directions was heavy that day and that he could not tell how long he waited before attempting his left hand turn. (Tareshawty Dep. 61). But, he said, it seemed like a long time. (Tareshawty Dep. 61). He testified that he looked left and right multiple times. (Tareshawty Dep. 66). He also testified that there were no distractions with regard to his ability to focus on his driving. (Tareshawty Dep. 67-71). When he concluded that it was safe to enter the intersection and make his turn, Tareshawty said there was a car in the western most *1004 lane of South Avenue traveling south which was slowing down, with the right turn signal on, to make a right hand turn onto McClurg. (Tareshawty Dep. 72, 79). At this point he decided he had enough room with regard to the oncoming north bound traffic on South Avenue to make his turn. (Tareshawty Dep. 80).
{¶ 69} When he proceeded, he said the motorcycle seemed to appear out of nowhere. (Tareshawty Dep. 80). He first saw the motorcycle while he was turning. (Tareshawty Dep. 83). From the moment he first saw the motorcycle until the impact was "maybe a second, not much more than that." (Tareshawty Dep. 84-85). Once he began his turn, he never looked back to the right but was looking to the left the entire time. (Tareshawty Dep. 86-87). Tareshawty explained:
Q Did you continue looking to the left the whole time as you were making the turn or were you looking ahead in the direction you were going?
A Left.
Q Is it correct then that from the time you decided to try to pull out to make your turn until the time of impact, you were looking left towards the direction where the motorcycle was coming from?
A Yes.
Q Do you have any idea why you didn't see the motorcycle until the front of your car was in that center turn lane that we have marked as quote "left lane" end quote, on Exhibit 8?
A No.
(Tareshawty Dep. 87). Tareshawty continued:
Q Do you believe you made a driving error when pulling out when you did?
MR. MEOLA: I object.
THE WITNESS: I really don't know.
BY MR. STRAUCH:
Q Well, I mean you know that you failed to see an oncoming motorcycle that had the right-a-way until it was too late for you to avoid the collision, isn't that right?
MR. MEOLA: I object.
THE WITNESS: Yes.
BY MR. STRAUCH:
Q Do you know why you failed to see the motorcycle before it was too late to avoid the collision?
MR. MEOLA: Objection. Asked and answered.
THE WITNESS: I don't know.
(Tareshawty Dep. 89).
{¶ 70} Although his estimation was that there were no telephone poles or signs that blocked his view, Tareshawty clearly was at a loss to explain what he did wrong or why the motorcycle appeared out of nowhere. (Tareshawty Dep. 80, 89).
{¶ 71} Not only did the trial court fail to consider the balance of Tareshawty's testimony, it improperly gave greater weight to only a portion of Tareshawty's testimony, especially when considered in light of the other evidence offered by appellant. Michael Sutton, a licensed professional engineer employed by Accident Research Specialists, PLLC, provided an affidavit which stated, in pertinent part:
In addition, I also concluded that based on the location where Mr. Tareshawty testified he stopped, Mr. Emmerling's speed and location, as well as the geometry of the sight obstruction created by the location of the signs, all explained why Mr. Tareshawty did not see the motorcycle when he looked to his left prior to pulling into the intersection while he was making the decision to pull into traffic.
*1005 (Sutton Affidavit, ¶ 4). Sutton stated that he was not addressing why the sign was or was not there but, rather, the question of whether the location of the sign is consistent with why Tareshawty looked and did not see the motorcycle. (Sutton Dep. 31). He concluded that the signs not only blocked the view on South Avenue, but they blocked the view at a critical time. (Sutton Dep. 31-32). It was his opinion, within a reasonable degree of engineering certainty, that it was the arrow sign that blocked Tareshawty's view. (Sutton Dep. 32). Sutton opined that, looking at the physical evidence:
[I]f you look at his [Tareshawty's] deposition testimony about where he crept up to, it puts him right in the area where that sign will block the motorcycle for a period of time. So when the-when the driver of the van tells me that he looked several times back and forth, he didn't see anything coming, the most likely and the most logical explanation is the motorcycle wasn't in view because of the sign.
(Sutton Dep. 33). When confronted with Tareshawty's testimony that in his [Tareshawty's] estimation the signs did not obstruct a driver's view, Sutton explained:
[E]ither the signs blocked his view of traffic or he was in a position where the signs were not a factor and he looked right at the motorcycle and pulled out in front of it. But, I think, based on every-everything that has been documented about these signs and the-and, for instance, the safety report I reviewed, acknowledges that the signs block oncoming traffic. And it fits this accident, because he says, (as read) "I looked and I never saw the motorcycle till it was hitting me."
(Sutton Dep. 41).
{¶ 72} By emphasizing only Tareshawty's estimation about the signs, and ignoring the balance of Tareshawty's testimony, the expert's opinions, and the other attendant facts, the trial court weighed the evidence, which it is not permitted to do in ruling on a summary judgment motion.
{¶ 73} For these reasons, I would reverse the decision granting summary judgment and would remand the matter to the trial court.